1
2
3
4
5
6
7
8

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         jwilner@bursor.com
         jglatt@bursor.com
         rmartin@bursor.com

9    *Attorneys for Plaintiff*

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14

| | |
|---|---|
| MARK BERARD, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>    v.<br><br>COLEWILLAIDAN, LLC, d/b/a COLE'S SEAFOOD<br><br>                                    Defendant. | Case No.   2:25-cv-6462<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Mark Berard ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Colewillaidan, LLC, d/b/a Cole's Seafood ("Defendant").  Plaintiff makes the following allegations pursuant to the investigations of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.       Plaintiff brings this class action lawsuit on behalf of himself and all others similarly situated who purchased Defendant's canned farmed salmon Products (the "Products").[1]

2.       The flesh of farm-raised salmon is naturally grey or white because they do not receive the beta carotenes that wild salmon feast on.  To make farm raised salmon a more appealing pink, fish farmers incorporate one of two color additives into the fish feed: astaxanthin or canthaxanthin.

3.       Defendant's Products contain farm-raised fish in net-pens in Chile.  Thus, the only way that the fish in Defendant's Products get their signature and appealing pink is from the color additives Defendant intentionally incorporates into the fish feed.

4.       Indeed, independent testing conducted by Plaintiff's counsel confirmed the presence of astaxanthin in one of Defendant's salmon fillet products.  Because the Product contains a color additive, Defendant was required to disclose it on the

---

[1] This includes all farmed salmon Products Defendant sells, including: Patagonian Smoked Salmon Fillet in Extra Virgin Olive Oil, Patagonian Smoked Salmon in Water, Patagonian Salmon in Water, Patagonian Smoked Salmon with Lemon Dill and Extra Virgin Olive Oil, Patagonian Smoked Salmon Fillet with Quinoa, and Patagonian Smoked Salmon Fillet with Vegetables.

label "[t]o prevent economic fraud in salmonid[2] fish containing added astaxanthin[.]"63 Fed. Reg. 18738 (1998).  Defendant never did.

5.     As such, Plaintiff sustained injuries by purchasing Defendant's Products which were deceptively marketed as containing salmon with a healthy, natural pink coloring when Defendant's Products were ***artificially*** colored.

6.     Accordingly, Plaintiff brings claims against Defendant individually and on behalf of classes of all others similarly situated for violations of (1) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.;* (3) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.;* (4) breach of express warranty; and (5) unjust enrichment.

## PARTIES

7.     Plaintiff Mark Berard is a citizen of California and resident of Los Angeles, California.  Plaintiff Berard purchased Defendant's Patagonian Smoked Salmon Fillet with Vegetables in or around June 2024 from a Target store in Los Angeles, California.  Prior to his purchase, Plaintiff Berard reviewed the Product packaging and reasonably understood that there were no color additives in the Product given that the packaging was entirely devoid of any such representation. Rather, the Product's labeling presented a fish fillet with a pink hue.  As such, Plaintiff Berard reasonably understood those omissions to mean that Defendant's Products were of a higher quality because Defendant did not use color additives. Those representations and warranties were part of the basis of the bargain, in that he would not have purchased the Product on the same terms had he known those representations were not true.  In making his purchase, Plaintiff Berard paid a price premium due to the false and misleading representation that the Product he purchased contains a naturally colored salmon filet free of artificial dyes and

---

[2] Salmonidae is a family of 200 species of fish that includes salmon and trout. Collectively, these species are referred to as "salmonids."

coloring.  Accordingly, Plaintiff Berard relied on these representations and warranties in deciding to purchase the Product.  Had Plaintiff Berard known that the Product contained artificial coloring he would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff Berard did not receive the benefit of his bargain because the Product was not, in fact, naturally colored but instead artificially colored.

8.    Plaintiff Berard remains interested in purchasing the Products from Defendant.  However, he is unable to determine if the Products' quality and whether they are actually free of artificial coloring.  He understands that the composition of the Products may change over time, but as long as Defendant continues to represent the Products as being free of artificial coloring, when they are not, he will be unable to make informed decisions about whether to purchase the Products and will be unable to evaluate the different prices between Defendant's Products and competitors' products.  Plaintiff Berard is further likely to be repeatedly misled by Defendant, unless and until Defendant is compelled to ensure that the Products' marketing as being free of artificial coloring, is, in fact, true.

9.    Defendant Colewillaidan LLC, is a Rhode Island limited liability company with its principal place of business in Melrose, Massachusetts.  Defendant does business as Cole's Seafood.  Defendant markets, sells, and distributes the Products throughout the United States, including in California.  Defendant manufactured, marketed, and sold the Products at issue at all times during the relevant Class Period.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Members of the Classes, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Member of the Classes is a citizen of a state different from Defendant.

11.     This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within California, including this District, and purposefully avails itself to the benefits of this District by selling its Products in this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### A.     The Rise of Farm Raised Fish

13.     The farmed fish industry (also know as "aquaculture") accounts for half of the world's fish supply.[3]  Indeed, the farmed salmon industry is estimated to be worth $20 billion a year.[4]  "In 2022, more fish were farmed than were captured from the ocean."[5]

14.     Salmon–being high in omega-3 fatty acids, DHA, and EPA– is one of the healthiest foods to consume and the second most popular seafood item in the United States.[6]

15.     Salmon is associated with lowering this risk of stroke, heart disease, and high blood pressure.  It is also known to protect against inflammation, obesity, and cognitive decline.[7]  These factors have contributed to a high demand for salmon.

---

[3] Felix Richter, *Aquaculture Accounts for Half of the World's Fish Supply*, STATISTA (Nov. 21, 2022), https://www.statista.com/chart/2280/the-global-fish-farming-industry-is-booming/.

[4] Douglas Frantz and Catherine Collins, *3 Reasons to Avoid Farmed Salmon*, TIME MAGAZINE (July 21, 2022), https://time.com/6199237/is-farmed-salmon-healthy-sustainable/.

[5] Priscilla Du Preez, *Salmon is Probably Not as Healthy as You Think*, FARM SANCTUARY (Aug. 9, 2024), https://www.farmsanctuary.org/news-stories/salmon-not-healthy/.

[6] Mahita Gajanan, *How Farmers Turn Their Salmon Pink*, TIME MAGAZINE (June 13, 2017), https://time.com/4790794/farmed-salmon-pink/.

[7] *See* NIH, *supra* note 2.

---

16.     But because salmon consumption has risen in popularity, wild salmonid populations on both U.S. coasts have declined significantly.  Human impacts like dams, overfishing, pollution, and climate change, are largely to blame.[8]

17.     For example, 28 different salmonid species that call the West Coast home have been listed as threatened or endangered under the Endangered Species Act.[9]  And despite their protected status, most of those species continued to struggle and decline.[10]

18.     On the East Coast, Atlantic salmon is the only native salmon species. Like their West Coast relatives, human activities have decimated the wild Atlantic salmon populations, culminating in the total collapse of Atlantic salmon fisheries[11] by 1948.[12]  Those fisheries never again reopened and today all Atlantic salmon available for purchase in the United States is farmed.[13]

---

[8] *What is Hurting Salmon?*, WASHINGTON STATE RECREATION AND CONSERVATION OFFICE, https://rco.wa.gov/salmon-recovery/problem/.

[9] West Coast Regional Office, *Report Card on Recovery: Reviews Assess 28 Salmon and Steelhead Species Returning to West Coast Rivers*, NAT'L OCEANIC AND ATMOSPHERIC ADMIN. FISHERIES (last updated Dec. 11, 2024), https://www.fisheries.noaa.gov/west-coast/endangered-species-conservation/report-card-recovery-reviews-assess-28-salmon-and#:~:text=Under%20the%20Endangered%20Species%20Act,review%20answers%20questions%20such%20as:.

[10] *Id.*

[11] The term "fishery" refers the areas of bodies of water where certain populations of fish can be caught for commercial or recreational purposes.  (For more information *see*, *What is a Fishery*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-au/what-we-are-doing/our-collective-impact/what-is-a-fishery#:~:text=A%20basic%20definition%20of%20a,species%20of%20fish%20or%20shellfish. .

[12] *Atlantic Salmon*, NAT'L OCEANIC AND ATMOSPHERIC ADMIN. FISHERIES, https://www.fisheries.noaa.gov/species/atlantic-salmon-protected/overview .

[13] *Id.*

---

19.     With the wild salmon population shrinking but consumer demand for salmon growing, aquaculture (or fish farming) became popularized in the 1960s.[14]

20.     Aquaculture works by casting net pens that float a few hundred yards offshore.  The pens are anchored in place with heavy cables attached to the sea floor.[15]  Hatchery-born salmon are transferred to these pens at 10 months old,[16] where they are fed pellets made of fish meal, fish oil, vitamins, color additives, and antibiotics.  Each pen can hold between 15,000 and 50,000 salmon. A single farm



can operate eight to ten pens.

***Chilean Salmon Farm***

**B.     Consumers Prefer Wild Caught Salmon Over Farm-Raised**

21.     Unlike wild-caught salmon, "[f]armed salmon serves as an inferior food source, accumulating more toxic chemicals in fatty tissue with fewer healthy nutrient

---

[14] *See* Bruce Barcott, *Aquaculture's Troubled Harvest*, MOTHER JONES (November/December 2001), https://www.motherjones.com/politics/2001/11/aquacultures-troubled-harvest/.

[15] *Id.*

[16] *Id.*

properties[.]"[17]  Research shows that consuming farmed salmon leads to higher instances of metabolic disorders like diabetes and obesity,[18] contrary to the largely understood health benefits of salmon generally.

22.    "Some studies warn that a single meal per month of farmed Atlantic salmon can expose consumers to contaminant levels exceeding standards from the World Health Organization.  The risk is greatest for infants, children, and pregnant women because of the potential harm from contaminants to developing brains."[19]

23.    Accordingly, nutritionists explain that for consumers to get the health benefits of salmon–which consumers like Plaintiff reasonably expect–they need to eat wild rather than farmed salmon.[20]

24.    Moreover, a blind taste test shows that while consumers preferred the taste of farmed salmon over wild salmon, as soon as they were informed that the salmon was farmed, they indicated that they would still choose the wild salmon product over a farmed salmon product.[21]  Accordingly, whether the product is wild caught or farm raised is material to a consumer's purchasing decision.

25.    Importantly, consumer research confirms that color plays a decisive role for evaluating the quality of salmon at point-of-sale.  For example, consumer

---

[17] *Farmed Salmon Just as Toxic to Human Health as Junk Food*, BEYOND PESTICIDES (June 16, 2022), https://beyondpesticides.org/dailynewsblog/2022/06/farmed-salmon-just-as-toxic-to-human-health-as-junk-food/.

[18] *Id.*

[19] Frantz and Collins, *supra* note 4.

[20] *Id.*

[21] Helene Christine Reinbach, *We Prefer Farmed Salmon – As Long As We Don't Know What We're Eating*, UNIVERSITY OF COPENHAGEN FACULTY OF SCI. (Nov. 22, 2021), https://science.ku.dk/english/press/news/2021/we-prefer-farmed-salmon--as-long-as-we-dont-know-what-were-eating/.

research has found that color is considered the consumers' primary consideration in purchasing salmon.[22]

26.     Consumers believe that color indicates a salmon's species, age, origin, price, expected flavor/texture, ***freshness***, ***and quality***. Consumers equate redder flesh as a sign of higher quality salmon and are willing to pay more for deeply



colored salmon.

27.     To find the right color, fish farmers use a "SalmoFan"—like an artist's color wheel—to determine how much astaxanthin a farmer needs to add to the feed to achieve the desired color.

### *SalmoFan*

28.     Not surprisingly then, wild salmon, which is usually a much deeper red than its farmed peers, "fares better on the market because the deep red carries cultural significance, a reminder of a time before mass farming when salmon was 'the fish of the rich.'"[23]

---

[22] Gajanan, *supra* note 8 ("If we didn't do it, customers wouldn't buy it … Consumers buy what they're familiar with. They won't go into the store to buy white salmon.").

[23] *Id.*

29.    Accordingly, salmon farmers have admitted that if they did not include the color additive in their products, consumers would not purchase their products at all.[24] Indeed, color is so important to consumers that they "will pay up to $1 per pound more for darker colored salmon compared to salmon with lighter hues[.]"[25]

30.    However, once "consumers know that color has been added to farmed salmon, they are less willing to pay for the darkest fish[.]"[26] For this reason, salmon farmers like Defendant, seek to hide the use of color additives in their Products.

31.     To prevent this fraud, Federal and California law requires that color additives be noted on salmonid products to ensure that consumers are *actually* buying what they believe they are buying.

**C.    Defendant Adds Color Additives To Its Products Which The FDA Requires Be Disclosed**

32.    Defendant manufactures, distributes, advertises, and sells multiple salmon Products that contain farm-raised salmon.  The Products are sold online and in brick-and-mortar stores throughout California and the Unted States.

**1.    Plaintiff Berard's Product And All Substantially Similar Versions**

33.    Plaintiff Berard purchased Defendant's Patagonian Smoked Salmon Fillet with Vegetables (pictured below) which is part of Defendant's ready-to-eat line of canned salmon products.  All of Defendant's ready-to-eat Products are substantially similar in that they contain Chilean farmed salmon, have similar packaging, and have similar nutritional impacts, and are sold with the same false and misleading failure to disclose artificial coloring.

_____

[24] *Id.*

[25] *Id.*

[26] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    9

1

2

3

4

5

6

7

8

9



10    ***Front and Back of Defendant's Ready to Eat Smoked Salmon Fillet with***

11                                    ***Vegetables***

12        34.    As shown, Defendant's ready-to-eat Patagonian Smoked Salmon Fillet

13    with Quinoa is substantially similar to that which Plaintiff purchased.  Both

14    Plaintiff's Product and the Patagonian Smoked Salmon Fillet contain fish from farms

15    with labels presenting them with a pink hue.  As farmed fish, each must necessarily

16    have been fed with artificial feed.  Likewise, each labeling contains the same failure

17    to disclose the presence of astaxanthin.

18

19

20

21

22

23    

24

25

26

27

28



35.    Defendant's Patagonian Smoked Salmon Fillet with Vegetables is also substantially similar to Defendant's other canned salmon Products because, on information and belief, the salmon used in the Products come from the same Chilean salmon farm or are farmed using the same standards and practices and the labels for those Products also fail to disclose the use of color additives.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Defendant's Canned Patagonian Salmon in Water*



*Defendant's Canned Patagonian Smoked Salmon in Water*

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

***Front and Back of Defendant's Canned Patagonia Smoked Salmon in Olive Oil***

36.     Salmon, like flamingos, get their signature pink color from the food they eat.  In the wild, salmon consume carotenoids from microalgae, phytoplankton, and small fish that make their flesh pink.[27]

37.     Farm raised salmon—which live on a diet of pellets and antibiotics—do not consume beta carotenes.  Thus, farmed raised salmon flesh is grey or white rather than pink.[28]  To correct this, farmers include astaxanthin in the feed which serves to provide the coloring that wild salmon would get from their natural diets.

38.     Defendant's Products are all farm-raised in net-pens in Chile.  To create the pink hue on the labeling of Defendant's Products, Defendant necessarily adds astaxanthin to its feed.

39.     Independent testing conducted by Plaintiff's counsel confirms this. A test of Defendant's Patagonian Smoked Salmon Fillet with Quinoa found that the fish contained astaxanthin.

40.     On information and belief, Defendant uses the same salmon in all of its salmon Products, and therefore, all of such Products contain color additives and lack the disclosure of such color additives.

41.     Because consumers understand the health benefits of salmon and equate the pink coloring with those benefits, consumers prefer a brighter pink coloring which astaxanthin provides.[29]

42.     In order to protect consumers from being mislead about the nature of their fish due to its color, federal regulations and identical state law require the disclosure of such color additives.

43.     Under the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 343, a salmonid product is misbranded when the product packaging fails to inform consumers of the presence of the artificial coloring astaxanthin.  Specifically, the

---

[27] Barcott, *supra* note 14.
[28] Gajanan, *supra* note 8.
[29] *Id.*

implementing regulations require that "[t]he presence of the color additive in salmonid fish that have been fed feeds containing astaxanthin shall be declared in accordance with § 101.22(k)(2) … of this chapter."  21 C.F.R. § 73.35(d)(3).

44.    The labeling requirement may be satisfied with statements on the packaging like "'Artificial Color,' 'Artificial Color Added,' or 'Color Added' (or by an equally informative term that makes clear that a color additive has been used in the food)."  21 C.F.R. § 101.22(k)(2).  Defendant fails entirely to disclose the added coloring.

45.    Laws enacted by most states, including California, also require this disclosure.  California's Health and Safety Code declares that "[a]ny food is misbranded if it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless its labeling states that fact."  Cal. Health & Safety § 110740.  Moreover, for salmon specifically the California Health and Safety Code expressly incorporates the FDA's labeling requirements.  *See* Cal. Health & Safety Code § 110795.  However, as shown above, the labels, which Plaintiff and Members of the Classes viewed and relied on when making their purchases, is entirely devoid of these mandated disclosures.

**D.    Defendant Knew or Should Have Known That Consumers Would Be Misled By Its Omissions**

46.    Defendant pursued a nationwide policy to violate federal and state regulations by concealing that its Products contain (and continue to contain) artificial coloring.

47.    As alleged in greater detail above, the presence of artificial coloring, like astaxanthin, is material to consumers' purchasing decisions as their decisions are guided by the presentation of the product and its coloring.

48.    Astaxanthin is very expensive, accounting for 20% of the cost of the feed for farmed salmon.[30]  But because color is a significant factor in the purchasing

---

[30] *Id.*

decisions of consumers, fish farmers find that adding color additives to the feed is worthwhile.[31]  Moreover, this cost is likely pushed onto consumers who, unbeknownst to them, are incurring additional costs for a product they purchased under false and misleading pretenses.

49.     As such, the addition of artificial color to farm-raised salmon increases its marketability and inflates the price of the Products.

50.     However, Defendant, despite labeling the salmon as farm raised, did not disclose its use of astaxanthin in its Products.  Therefore, Defendant's concealment of artificial coloring misled consumers, including Plaintiff and Members of the proposed Classes, into believing that the fish they purchased did not contain color additives and so was of a higher quality akin to wild caught.

51.     By concealing the presence of artificial color in its Products, Defendant capitalized on consumers' understanding of the higher quality salmon.  This conduct was uniform across all of the Products.

52.     In line with the F.D.A.'s concern and corresponding labeling requirements, "transparency, better regulation, and accurate labels on farmed salmon are essential to ensure good choices for our health[.]"[32]

53.     Unfortunately for consumers, the Products "looks like [they] came from the same place as [their] wild relation, with that rich, pink hue. … Nothing, apart from the bargain-basement price tag, to give away the reality of intensive salmon production, which has turned the King of Fish into the battery chicken of the seas."[33]

---

[31] Donna Byrne, *Disclosing the Potentially Dangerous Dyes that Make Gray Salmon Pink: The California Supreme Court Holds that Actions to Enforce the State's Food Labeling Law Are Not Preempted By Federal Law*, FINDLAW (Feb. 18, 2008), https://supreme.findlaw.com/legal-commentary/disclosing-the-potentially-dangerous-dyes-that-make-salmon-pink.html.

[32] *Id.*

[33] Stuart Millar, *How the King of Fish is Being Farmed to Death*, THE OBSERVER (Jan. 6, 2001),

---

54.    Given consumers' reliance on color in their purchasing decision, their preference for health-benefit-supporting salmon, consumers like Plaintiff were injured by Defendant's failure to comply with its labeling requirements.

55.    By concealing the artificial coloring of their Products, Defendant has become unjustly enriched because consumers have been (and continue to be) misled into purchasing the Products in that they would not have done so or would have done so on substantially different terms.

56.    Although Defendant is in the best and exclusive position to know the true composition and contents of its Products, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

57.    **WHO:**  Defendant Colewillaidan, LLC, d/b/a Cole's Seafood

58.    **WHAT:**  Defendant's conduct here was, and continues to be, deceptive because it had a duty to disclose that its Products contain a color additive but failed to do so on the Products' packaging.  The inclusion of color additives in its Products was material to Plaintiff's and Class Members' purchasing decisions by giving the impression that the Products were of a wild-caught quality.  Defendant knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and the Members of the Classes when they made their purchasing decisions, yet consistently failed to disclose this.

59.    **WHEN:**  Defendant made material misrepresentations and omissions during the putative class period, including prior to and at the time of Plaintiff's and the Members of the Classes' purchases, despite Defendant knowing—or reasonably should have known—that the Products contained astaxanthin.  Plaintiff viewed the packaging and advertising of the Products at the time of purchase and viewed the representations and warranties made by Defendant on the packaging and

---

https://www.theguardian.com/environment/2001/jan/07/fishing.food#:~:text=It%20is%20estimated%20that%20a,a%20town%20of%2020%2C000%20people.

corresponding marketing, understanding them to mean that the Products were of a higher, fresher, naturally caught composition than typical farm raised salmon.

60.     **WHERE:**  Defendant's marketing messages were uniform and pervasive throughout California and the United States, carried through material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

61.     **HOW:**  Defendant made material omissions of fact regarding the Products by failing to disclose that the Products include color additives and therefore misled consumers into believing the Products were of a higher quality than they are.

62.     **WHY IT IS FALSE:**  Defendant made material omissions by failing to disclose that the Products include color additives.  These omissions convey to consumers that the Products are a higher quality than other farm-raised salmon, and thereby giving the Products a quality comparable to, if not the same as, wild-caught.

63.     **INJURY:**  Plaintiff and the Members of the Classes purchased, and paid a premium, or otherwise paid more for the Products that they otherwise would not have—had they known that the Products contained color additives and, so, was of a lesser quality than a wild-caught fish.

## CLASS ALLEGATIONS

64.     ***Nationwide Class.***  Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Products during the applicable statute of limitations period.

65.     ***California Subclass.***  Plaintiff brings this California Subclass action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the subclass defined as:

> All persons in the State of California who purchased the Products during the applicable statute of limitations period.

66.    Unless otherwise specified, the "Class" shall refer to the Nationwide Class.  The Classes collectively shall be referred to as the "Classes."

67.    Excluded from the Classes are: (1) persons who made such purchases for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

68.    ***Numerosity.***  At this time, Plaintiff does not know the exact number of members of the Classes.  However, given the nature of the claims, Plaintiff believes that the Members of the Classes are so numerous that joinder of all members is impracticable.

69.    There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to members of the Class and Subclass that predominate over questions that may affect individual Class Members include:

(a)    Whether the Products contained astaxanthin;

(b)    Whether a reasonable consumer would understand Defendant's marketing and packaging to understanding that the Products would be free of color additives like astaxanthin;

(c)    Whether Defendant failed to disclose material facts concerning the Products;

(d)    Whether Defendant had a duty to disclose the presence of astaxanthin in its Products;

(e)    Whether Defendant's conduct was unlawful;

(f)    Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class and Subclass;

(g)    Whether Plaintiff, the Class, and Subclass sustained damages with respect to common law claims asserted, and if so, the proper measure of those damages.

70.    With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated California Civil Code § 1750, *et seq*., California's Consumers Legal Remedies Act ("CLRA"); California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq*. ("UCL"); and California's False Advertising Law, California Business & Professions Code § 17500, *et seq*. ("FAL").

71.    ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like other Members of the Classes, purchased the Products relying on the omissions made by Defendant on the Products' packaging.

72.    ***Adequate Representation.***  Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

73.    ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class and Subclasses.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

74. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75. Plaintiff brings this claim individually and on behalf the Members of the California Subclass against Defendant.

76. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

77. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

78. Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

79. Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that the Products contained astaxanthin, a color additive.

80. Defendant had exclusive knowledge and/or superior knowledge of the contents of the Products as it was responsible for maintaining its farms and feeding its fish, which was not known to Plaintiff or the Subclass.

81. Defendant's omissions materially mislead Plaintiff and the Members of the Subclass while suppressing the true nature of the Products. Specifically, by failing to disclose that the Products' coloring was the result of synthetic color

---

additives, Defendant misrepresented the Products as being of a higher quality consumers attach to naturally colored, wild caught salmon.

82.    Plaintiff and the Subclass have suffered harm as a result of these violations because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

83.    On April 15, 2025, prior to the filing of this complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  The letter advised Defendant that it was in violation of the CLRA with respect to the presence of astaxanthin in the Products and demanded that Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom to consumers.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant failed to remedy the issues raised by the notice letter.

84.    Pursuant to Civ. Code § 1780, Plaintiff and the Subclass seek: (a) actual damages in an amount to be determined at trail; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and Members of the Subclass as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

<u>COUNT II</u>
**Violation of California's Unfair Competition Law ("UCL")**
**California Civil Code § 17200, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

85.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

86.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

87.    California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed

above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

88.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** by misbranding its Products pursuant to 21 U.S.C. § 343, by violating FDA's labeling requirements for salmonids under 21 C.F.R. 101. § 101.22(k)(2).

89.     Defendant also engaged in unlawful business practices by misbranding its Products under California law, Cal. Health & Safety Code §§ 110740 and 110795, by failing to follow FDA's labeling requirements for salmonid fish.

90.     Finally, Defendant engaged in unlawful business practices by violating CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9); and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.

91.     As described more fully above, Defendant's misleading marketing, advertising, packaging, and labeling of its Products is likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, *inter alia*, omitting material facts as set forth more fully above, thereby violating the common law.

92.     Defendant also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendant's acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constitutes "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

93.     There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described above.

94.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendant's claims, nondisclosures, and

misleading statements with respect to the Products, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

95.    Plaintiff and the Members of the Subclass suffered substantial injury by buying Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of astaxanthin in the Products.

96.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

97.    Plaintiff and the Members of the Subclass had no way of reasonably knowing that the Products they purchased were not marketed, advertised, packaged, or labeled in conformity with legal requirements.  Thus, they could not have reasonably avoided the injury each of them suffered.

98.    The gravity of the consequences of Defendant's conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other Members of the Subclass.

99.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Subclass seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to Plaintiff and the other Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

100.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

101.   Plaintiff brings this claim individually and on behalf of themselves and the California Subclass against Defendant.

102.   Defendant's acts and practices, as described herein, have deceived and are likely to continue to deceive members of the California Subclass and the public. As described throughout this complaint, Defendant misrepresented the true nature and quality of the Products by omitting on their labeling—as required—that the Products contain color additives thus giving consumers like Plaintiff the impression that the Products are of a quality comparable to, if not the same as, wild-caught fish. However, the Products are not, as they get their pink coloring from astaxanthin, a synthetic color additive.

103.   By its actions, Defendant disseminated uniform advertising regarding the Products to and across California and the United States.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public.

104.   The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain color additives.

105.   Defendant continues to misrepresent the true nature and quality of the Products by omitting on the Products' labeling that the coloring comes from artificial sources.

106.   In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and the Members of the Subclass based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to millions of dollars.  Plaintiff and the Members of the Subclass were injured in fact and lost money and property as a result.

107.   The omissions by Defendant and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

108.   As a result of Defendant's wrongful conduct, Plaintiff and the Members of the Subclass lost money in an amount to be proven at trial.  Plaintiff and the Members of the Subclass are therefore entitled to restitution as appropriate for this cause of action.

109.   Plaintiff and the Subclass therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

## COUNT VI
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)

110.   Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

111.   Plaintiff brings this claim individually and on behalf of the Nationwide Class under the laws of California.

112.   To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

113.   Plaintiff and the Class conferred benefits on Defendant by purchasing the Products.

114.   Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and the members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products contained color additives, misleading consumers like Plaintiff to reasonably believe that the Products were of a quality akin to wild caught fish instead of the

lessor net pen farm-raised quality.  These omissions caused injuries to Plaintiff and the Members of the Class because they would not have purchased the Products if the facts were known.

115.   Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Members of the Class is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgement against Defendant as follows:

(a)   For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's attorneys as Class Counsel;

(b)   For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 15, 2025                Respectfully submitted,

                                    **BURSOR & FISHER, P.A**.

                                    By:    /s/ *L. Timothy Fisher*
                                              L. Timothy Fisher

                                    L. Timothy Fisher (State Bar No. 191626)
                                    Joshua R. Wilner (State Bar No. 353949)
                                    Joshua B. Glatt (State Bar No. 354064)
                                    Ryan B. Martin (State Bar No. 359876)
                                    1990 North California Blvd., 9th Floor
                                    Walnut Creek, CA 94596
                                    Telephone: (925) 300-4455
                                    Facsimile:  (925) 407-2700
                                    E-mail: ltfisher@bursor.com
                                              jwilner@bursor.com
                                              jglatt@bursor.com
                                              rmartin@bursor.com

                                    *Attorneys for Plaintiff*

## CLRA VENUE DECLARATION

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff.  Plaintiff Berard resides in Los Angeles, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper venue for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Central District of California, as Plaintiff Berard resides in this District and purchased the Products from a store in this District. Additionally, Defendant advertises, markets, manufacturers, sells, and distributes the Products at issue to Class Members in this District.

3.      I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at New York, NY this, the 15th of July, 2025.


        _*/s/ L. Timothy Fisher*____
               L. Timothy Fisher